UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10179-GAO

UNITED STATES OF AMERICA, ex rel.
CHRISTOPHER DRENNEN,
Relator,

v.

FRESENIUS MEDICAL CARE HOLDINGS, INC.,
d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA,
Defendant.

OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION
March 31, 2017

O'TOOLE, D.J.

This is a qui tam action under the False Claims Act ("FCA"), see 31 U.S.C. § 3730, brought by the Relator, Christopher Drennen. The magistrate judge to whom this matter was referred has recommended that the United States' motion to intervene in this case be granted. Her Report and Recommendation ("R&R") also recommends that subsequent fact discovery by the government be limited. Both the defendant, Fresenius Medical Care Holdings, Inc. d/b/a Fresenius Medical Care North America ("Fresenius") and the government have filed written objections. Having reviewed the relevant submissions, I ADOPT the magistrate judge's recommendations except to the extent that she recommends that any subsequent discovery by the government be permitted.

First, the magistrate judge found that three categories of the government's "new" evidence were indeed new and significant and showed good cause to intervene.[1] Fresenius argues that the

---

[1] The magistrate judge also cited the public disclosure bar as a reason to allow intervention. Because I find that intervention is justified on the three newly discovered categories of evidence, it is unnecessary to address whether the public disclosure bar, a disputed issue in the litigation since at least the motion to dismiss stage, is adequate good cause for the government's intervention.

magistrate judge erred in finding this information to be new because the Relator knew much of it some time ago. The government has responded to Fresenius's objections that it received the discovery at issue from the Relator in April through July 2015. In July 2015, the Relator provided the government what it describes as a "compelling presentation" of the Relator's case. (United States' Resp. to Fresenius's Objs. to the Magistrate Judge's R&R, at 5 (dkt. no. 200).) Thus, the evidence the government points to is "new" to the government, which had not previously received it—even if it had been in the Relator's hands much earlier. Fresenius also disparages the significance of the three categories of evidence. However, the new evidence speaks to important trial issues: Fresenius' intent, its knowledge, its ability to reduce over-testing, and whether the BsAG testing was medically necessary. I agree with the magistrate judge that the government has put forward evidence that provides good cause to intervene.

The magistrate judge also analyzed whether allowing the government to intervene would prejudice Fresenius or result in any undue delay. Fresenius argues that it is prejudiced because allowing the government to intervene substantively eliminates a potential defense, the public disclosure bar, that is available against the Relator but not the government. However, even when it has not intervened to control the litigation, the government remains the real party in interest in the qui tam action. U.S. ex rel. Karvelas v. Melrose-Wakefiled Hosp., 360 F.3d 220, 231 (1st Cir. 2004) *abrogated on other grounds by* Allison Engine Co. v. U.S. ex rel. Sanders, 553 U.S. 662 (2008). And when the government is a legitimate party to the case, it is the policy of the statute that it may avoid the public disclosure bar. See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 477–78 (2007).

The R&R recommends denying any further discovery of patient records, reasoning that enough had already been provided to the Relator, and that denying any further discovery into these

records was necessary to prevent undue delay. The magistrate judge also noted that the government knew for months that it might seek leave to intervene, but never represented that it would require additional discovery. The government argues in its objections to the R&R that it had no way of knowing that it would need additional patient charts until after it learned of the charts the Relator provided. Given the number of patient charts the government already has, and considering the countervailing interests of avoiding undue delay in allowing the government to intervene, the magistrate judge did not err by recommending that the government be denied any additional discovery into patient records, and I adopt her recommendation.[2]

Fresenius argues that even if the government is not allowed additional discovery of patient records, the magistrate judge's recommendation that Fresenius and the government reevaluate the case and consult on potential additional fact discovery would cause undue delay. I agree, and overrule the R&R to the extent that it leaves the door open for further discovery by the government.

Regarding additional discovery for the defendant, I adopt the proposal put forth in Fresenius's Response to Court Order Regarding Discovery (dkt. no. 198) that it is be permitted to serve discovery requests on the government "that it would have been permitted . . . had the government been a party during discovery, including taking depositions of government witnesses and making written discovery requests of the government." The number of any such requests and depositions shall be limited to the total number previously authorized by the Court less the number already expended by Fresenius in the course of litigation. The discovery deadline shall be set for

---

[2] Effective December 1, 2015, Rule 26 highlights that discovery should be "proportional to the needs of the case." Fed. R. Civ. Pro. 26(b)(1). The need for proportionality is especially relevant here, where the potential costs and delay of additional patient chart discovery is so high. Cf. Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 n.4 (1st Cir. 2011) (applying the new version of Rule 56 to a case filed prior to the amendment where doing so was "just and practicable and would not work a manifest injustice").

June 30, 2017. Permitting the defendant this additional fact discovery will not cause *undue* delay. With or without the government, this case will have been pending for over seven years by the time of trial.

**I.**      **Conclusion**

Having reviewed the relevant submissions, I approve and ADOPT the magistrate judge's recommendation (dkt. no. 196) except as described above. The government's Motion for Leave to Partially Intervene for Good Cause (dkt. no. 178) is GRANTED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA ex rel.,          )
CHRISTOPHER DRENNEN,                        )
                                            )
               Relator,                     )
        v.                                  )          CIVIL ACTION
                                            )          NO. 09-10179-GAO
FRESENIUS MEDICAL CARE                      )
HOLDINGS, INC., d/b/a FRESENIUS             )
MEDICAL CARE NORTH AMERICA,                 )
                                            )
               Defendant.                   )


# REPORT AND RECOMMENDATION ON UNITED STATES'
## MOTION FOR LEAVE TO PARTIALLY INTERVENE FOR GOOD CAUSE

January 14, 2016

DEIN, U.S.M.J.

## I.   INTRODUCTION

This matter is before the court on the United States' Motion for Leave to Partially Inter-

vene for Good Cause, brought pursuant to 31 U.S.C. § 3730(c)(3).  (Docket No. 178).  The

Relator has brought a complaint under the False Claims Act ("FCA") alleging that Fresenius

violated 31 U.S.C. § 3729(a)(1)(A) and (B) by knowingly billing Medicare for medically unneces-

sary tests (Count One), and that it violated 31 U.S.C. § 3729(a)(1)(G) and (B) by failing to repay

the overpayments to Medicare (Count Two).  By its present motion, the United States is seeking

to intervene in both counts of the Relator's First Amended Complaint to the extent that it is

alleged that, between February 10, 2003 and December 31, 2010, Fresenius filed false claims

with Medicare for medically unnecessary hepatitis B surface antigen (BsAG) tests.  The United

States is not seeking to intervene to the extent that the claims relate to hepatitis B surface antibody (BsAB) and ferritin tests.  The Relator assents to this motion, which is opposed by Fresenius.

Fresenius objects to the request to intervene, made almost six years after the Relator filed his complaint, and after the completion of fact discovery, as untimely.  In addition, Fresenius denies that there is good cause for the intervention at this stage, and argues that it will be prejudiced in the event that intervention is allowed, especially if more discovery is permitted.  At the court's request, the parties have submitted memoranda addressing the issue of whether, and to what extent, the addition of the United States would require additional discovery.  As detailed below, their opinions differ.

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the motion to partially intervene be allowed.  This court further recommends that, based on the present record, the United States not be permitted to obtain the additional 125 patient files it is requesting, but that other additional fact discovery be permitted either as agreed upon by the parties, or upon further order of the court.  In the alternative, this court recommends that the Government pay a substantial portion of any legal fees and costs incurred by Fresenius in connection with the production of any patient files.

## II.  <u>STATEMENT OF FACTS</u>

Fresenius is a nationwide operator of kidney dialysis clinics.  At issue in this litigation are BsAG tests for hepatitis B given to patients between February 10, 2003 and December 31, 2010. In particular, the Relator alleges that Fresenius billed the Government for BsAG tests performed

on dialysis patients more frequently than provided for in Medicare's National Coverage Deter-

miniations ("NCD") manual, without medical necessity.  It is undisputed that on January 1,

2011, Medicare changed its rules to include all hepatitis B tests in a single bundled payment

covering all aspects of a routine dialysis treatment.  Therefore, after December 31, 2010,

Fresenius did not bill separately for each test.

<u>**Government Investigation of Fresenius**</u>

Since the parties dispute whether the Government has improperly delayed seeking to

intervene, and whether the discovery of "new" information supports the delay, some historical

details are necessary.

The U.S. Attorney's Office in Boston issued subpoenas to Fresenius in October 1995,

seeking documents "explaining, discussing, or seeking to justify . . . repeated Hepatitis B testing

of patients who have been immunized against Hepatitis B" or "reflecting, discussing, explaining,

or seeking to justify the company's rate of testing per patient" for Hepatitis B.  (<u>Castle Decl.</u>

(Docket No. 39)[1] ¶ 34).  The investigation and settlement negotiations lasted for six years, and

involved the production of more than six million pages of documents, the examination of

witnesses under grand jury subpoenas, and the exchange of factual information and legal

arguments.  (<u>Id.</u> ¶ 37).  As part of the settlement, in 2000 Fresenius entered into a Corporate

Integrity Agreement ("CIA"), which included requirements concerning laboratory monitoring,

---

[1]  Fresenius submitted the Declaration of its Senior Vice President and Deputy General Counsel for
Litigation, Ronald L. Castle, in support of its motion to dismiss.  That motion was denied by the court on
March 6, 2012.  (Docket No. 51).

auditing, and the billing of tests, including those at issue here.  (Def.'s Mem. (Docket 181) at Exs. 5, 6).

In 2006, Fresenius had concerns about hepatitis testing frequencies and decided to conduct an internal audit.  On March 1, 2007, Fresenius provided the Government with a copy of its audit plan.  (Id. Ex. 7).  The Government decided to conduct its own investigation at this time as well.  (Id. Ex. 8).  Fresenius then canceled its own audit.  As detailed below, the significance of the cancellation of this internal audit is in dispute.  The eight year term of Fresenius' CIA ended in or around 2008, and by letter dated August 27, 2008, the Government notified Fresenius that it was being "removed from the current listing of Corporate Integrity Agreements, Certification of Compliance Agreements, and Settlement Agreements with Integrity Provisions[.]"  (Id. Ex. 15).

**The Current Litigation**

The Relator filed his complaint under seal on February 10, 2009.  (Docket No. 1).  The False Claims Act allows a 60-day period for the Government to investigate and decide whether to intervene.  31 U.S.C. § 3730.  The court allowed several motions to extend this period.  (See Docket Nos. 9, 12, 19).  The court denied the Government's final motion to extend, and the seal expired on October 20, 2010.  (See Docket No. 19).  During this period, on June 23, 2009, the Government issued a subpoena to Fresenius requiring, according to Fresenius, the production of data relating to millions of hepatitis B tests.  (See Def. Mem. at 6).

The case was unsealed, and summonses were issued, in February 2011.  In March 2011, the case was transferred from Judge Saris to Judge O'Toole.  On March 11, 2011, the Government issued an administrative subpoena to Fresenius requesting complete patient files for 100

patients, standing laboratory orders, and Fresenius' guidelines for hepatitis B testing.  (Def. Mem. at 7).  In addition, the Government conducted interviews with the medical directors of three clinics.  (Id.).

Relator filed his First Amended Complaint in July 2011.  (Docket No. 42).  Fresenius filed a motion to dismiss, which the Relator opposed.  (Docket Nos. 45, 49).  The United States filed a statement of interest in opposition to the motion to dismiss, noting therein that "[t]he United States remains the real party in interest in this matter, even though it has not intervened in the action." (Docket No. 50).  The motion to dismiss was denied on March 6, 2012.  (Docket No. 51).  Fresenius answered the complaint on March 20, 2012.  (Docket No. 52).

### Discovery Period

On July 23, 2012 the court set a discovery deadline of October 31, 2013.  (Docket No. 59).  The discovery deadline was extended to January 31, 2014, April 30, 2014, and then to July 29, 2014.  (Docket Nos. 71, 88, 112).  The Relator moved to extend the time for discovery on July 31, 2014 and the case was referred to this Magistrate Judge on October 8, 2014 for all pre-trial matters, including the motion to extend and related discovery motions.  (Docket Nos. 119, 133).  According to Fresenius, during this period it produced more than one million pages of documents, re-produced data that had previously been produced to the Government, and "wrote custom programming to provide an additional 12 million lines of data" relating to testing.  (Def. Mem. at 8).  In addition, Fresenius "undertook an eight-week project to restore archived data from a legacy billing system that was no longer in use to provide data to relator." (Id.).  Fresenius took one deposition, and the Relator took 24 depositions of Fresenius witnesses.  (Id.).

[5]

After extensive briefing, this court held a status conference on the outstanding

discovery issues on October 27, 2014.  (Docket No. 143).  At the hearing, a great deal of time

was spent on the production of additional patient charts, including what information was to be

included in the production, how the documents were to be obtained and copied, and who was

to bear the considerable costs for the production.  Based on the Relator's representation that

288 patient charts that he was requesting constituted a "statistically valid sample," this court

ordered Fresenius to "produce portions of the 288 patient charts identified by the plaintiff/rela-

tor that reflect treatment during the time period from 2003 forward" on a rolling basis, with the

production to be completed by December 31, 2014.  (Docket No. 141).  This court further

ordered that the Relator was "to pay the reasonable costs required to have the charts copied at

a HIPAA approved facility[,]" although either party could file a motion regarding the realloca-

tion of the costs at a later date.  (Id.).  With the exception of the production of the patient

charts, fact discovery was virtually complete.  (Id.).

The identification, location and copying of the patient files proved to be a complicated

process.  The parties jointly moved to extend the period for production of the patient records

to January 31, 2015, and then to March 31, 2015.  (Docket Nos. 149, 151, 157, 158).  Fresenius

was unable to locate the files for 27 of the patients, and the Relator agreed to identify

substitutions for those patients.  (See Docket No. 164).  Meanwhile, a mediation was held on

March 25, 2015, attended by the Government, but it was unsuccessful.  (Docket No. 159).

A status conference was held on May 11, 2015, which was attended by the Government.

The Relator was ordered to identify the 27 substitute patient files by May 25, 2015.  (Docket

No. 165).  A great deal of discussion was held regarding the appropriate scope of summary

judgment motions.  Fresenius indicated that it was intending to file a summary judgment

motion regarding the applicability of the "public disclosure bar."  As detailed infra, if the public

disclosure bar applies, the Relator can only prosecute claims for which he was an "original

source."  In the instant case, the parties agreed that this would substantially reduce the scope

of the litigation, since the Relator was not an original source except for a very small portion of

the case.  The Government indicated that there was "a strong possibility" that it would move to

intervene, which would eliminate the public disclosure bar.  (Docket No. 167 at 22).  At no time,

however, did the Government indicate that it would be requesting additional discovery if it

intervened.  At the hearing, the scheduling of expert discovery was also discussed.  (See, e.g.,

id. at 26-27).  Since expert discovery would also be greatly affected if the public disclosure bar

was found to apply, it was stayed pending further order of the court.  (Docket No. 165).

A status conference was held on July 15, 2015.  By that time, the Relator had identified

the 27 substitute patient files and, after much discussion and searching, Fresenius has produced

files for 25 of those patients, and has not located the files for two patients.  (See Def. Mem. at

9).  It does not appear that the Relator has identified any more patient files to substitute for

those two.  At the conference, the Government stated that it was close to coming to a decision

as to whether to move to intervene, but it required more time.  (See Docket No. 174 at 5).

Again, the Government did not indicate that it would be requesting any additional patient files,

just that its experts would need to review the files that already had been produced.  (Id. at 9-

11).  The parties confirmed that the only significant outstanding discovery was the review of the

patient files for the expert reports.  (See id. at 6-12).  Fresenius stated that the only dispositive

motion it intended to file related to the Relator's status as an original source.  (Id. at 4).

[7]

On September 3, 2015, the Government advised the parties that it intended to file a motion to partially intervene.  (See Docket No. 176).  In accordance with this court's order, the motion was filed on October 2, 2015, and, after briefing, a hearing was held on November 19, 2015.  (Docket Nos. 178, 188).  The court ordered additional briefing on the issue of what additional discovery would be required if intervention was permitted.  Briefing was concluded on December 7, 2015.

## III  ANALYSIS

## Standard for Intervention

Prior to 1986, the False Claims Act did not authorize the Government to intervene in a qui tam action after the initial investigation period.  In 1986, the Act was amended so that after the initial 60 day period to intervene (as may be extended), the court "may nevertheless permit the Government to intervene at a later date upon a showing of good cause."  31 U.S.C. §§ 3730(b)(2)-(3), 3730(c)(3).  The FCA "does not define 'good cause,' but courts have found good cause in cases where the government realized the magnitude of the alleged fraud was much larger than it had originally anticipated; where the government received additional and new evidence about the case; and where intervention would protect the interests of the relators."  United States v. Aseracare, Inc., No. 2:12-cv-0245-KOB, 2:12-cv-2264-KOB, 2:12-cv-0627-KOB, 2012 WL 5289475, at *2 (N.D. Ala. Oct. 24, 2012), and cases cited.[2]  In the instant

_____

[2]  The Government contends that the "good cause" provision requires an analysis of the affect of intervention on the Relator only and that the statute was so designed because the Government's intervention reduces the percentage of the relator's recovery.  See United States ex rel. Stone v. Rockwell Int'l Corp., 950 F. Supp. 1046, 1049 (D. Colo. 1996) (after reviewing legislative history court finds "that the 'good cause' requirement of § 3730(c)(3) was intended to protect the interests of the relator").  Thus, the Government argues, "good cause" is virtually assured where, as here, the Relator assents to the intervention.  In this court's view, this interpretation is too broad.  It apparently has not

case, the Government contends that intervention is warranted because it would eliminate the restrictions on the Relator's case imposed by the public disclosure bar, and because it recently discovered new evidence that caused it to reevaluate its position.  Fresenius denies that there is good cause for this belated intervention.

A.    **Is There "Good Cause" for the Government to Intervene**

**Public Disclosure Bar**

As the First Circuit has explained:

> the FCA includes jurisdictional bars that limit a district court's subject matter jurisdiction over qui tam actions ....  The first, known as the "public disclosure" bar, provides that a court does not have subject matter jurisdiction over any qui tam action that is "based upon the public disclosure of allegations or transactions" concerning the alleged fraud, unless, among other things, "the person bringing the action is an original source of the information."  31 U.S.C. § 3730(e)(4)(A).  A relator qualifies as an "original source" if (1) she has "direct and independent knowledge" of the information supporting her claims and (2) she "provided the information to the Government before filing an action."  Id. § 3730(e)(4)(B).

United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 16 (1st Cir. 2009).  In the instant case, Fresenius argues that the Relator, Christopher Drennen, is the "original source" for only a very small portion of the potential claims, and it has indicated that it intends to move for summary judgment on this grounds.  (See Docket No. 174 at 4).  As the Government argues, however, its intervention would cure any such jurisdictional bar.  (See Gov't Mem. at 4-5 (citing Rockwell Int'l Corp. v. United States, 549 U.S. 457, 478, 127 S. Ct. 1397, 1411-12,

---

been adopted by any court, and would virtually eliminate the "good cause" requirement since a relator may assent for any reason or no reason at all.  Even the Rockwell court, on which the Government relies, recognized that the legislative history also provided that the right to intervene could arise where the Government has "new evidence discovered after the first 60 days of the litigation" that made Government involvement more appropriate.  Id. at 1048.  See also id. at 1049 ("Even if good cause requires a showing of new evidence, the government has sustained that burden.").

167 L. Ed. 2d 190 (2007) (Government intervention eliminates the "original source" require-ment))).  Thus, this court finds that there is "good cause" for the Government's intervention in that it would enable the Government to seek recovery for the full amount of the (alleged) over-payments.

### Newly Discovered Evidence

The Government also asserts that there are four pieces of evidence uncovered by the Relator that constitute new and significant evidence warranting its intervention.  Fresenius contends that (1) any such information could have been learned by the Government many years ago, and (2) the Government's interpretation of the evidence is incorrect.  The evidence before this court is that while the Government may have had access to the information it now contends is "new" much earlier, its significance did not become apparent to the Government until the Relator had done extensive discovery and presented his findings to the Government. Moreover, the accuracy of the Government's interpretation of the evidence is best explored at trial.  See United States ex. rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr., No. 6:09-cv-1002-Orl-31DAB, 2011 WL 4480846, at *2 (M.D. Fla. Sept. 27, 2011) ("The question at this stage is whether the Government should be permitted to intervene, not whether it will ultimately prevail.").  Therefore, as detailed below, this court finds that the Government has met its burden of establishing "good cause" for its late intervention based on newly discovered evidence.  These four pieces of evidence will be addressed briefly herein.

1.    Dates of Pre-Test Standing Orders:  The Government contends that its initial review of the 100 patient charts it subpoenaed from Fresenius in March 2011 revealed that physicians had entered pre-test standing orders authorizing the testing at issue, thereby

refuting the claim that the tests were not medically necessary.  According to the Government, however, the Relator established that these orders were signed after the tests were performed. It is the Government's position that "such post-hoc signatures cannot serve as documentation of medical necessity as a matter of law."  (Gov't Mem. (Docket No. 179) at 9).  Fresenius argues that the Government has misinterpreted the records on which it is relying, that the Relator knew about the process for generating the records from his work at Fresenius, and not from discovery in the litigation, and that the documents on which the Government relies were produced years ago.  (Def. Mem. at 14-16).

   This court finds that some of the information may have been available to the Government years ago.  Nevertheless, this court accepts the Government's representation that "[u]ntil recently informed by relator's counsel, who supported their arguments with evidence obtained during discovery, the government did not understand that Fresenius required doctors to sign forms allegedly authorizing monthly BsAG tests on hepatitis-B immune patients *after* those BsAG tests already had been performed."  (Gov't Reply Mem. (Docket No. 187) at 7; see also Relator's Statement (Docket No. 180) at ¶ 3 ("it took relator almost three years of continuous litigation to uncover the full truth regarding, *inter alia*, Fresenius' utilization of 'post-hoc' computer printouts instead of legitimate physician orders to 'justify' millions of excessive tests fraudulently billed by Fresenius to Medicare.")).  Everyone agrees that whether physicians authorized the testing is of critical importance in this case.  However, the question whether the Government is correctly interpreting the information is best left for trial.  Therefore, this court finds that this evidence is newly discovered and significant, and supports the Government's intervention into this case.

[11]

2.      <u>Programming of Fresenius' Proton Computer System</u>:  According to the Government, during its early investigation it was advised by Fresenius that its computer system, called Proton, could not be programmed to schedule BsAG tests only if certain medical criteria were met, and, as a result, "monthly" tests had to be ordered, even if excessive, in order to avoid the risk of skipping tests ordered by a doctor.  (Gov't Mem. at 9).  Further, according to the Government, during discovery in this case the Relator learned from Fresenius's witnesses that Fresenius never requested its IT department to attempt such a program, and that such a program could, in fact, have been written.  (<u>Id.</u> at 10).  According to the Government, this failure to attempt to program the computer appropriately violated Fresenius' CIA, which required the defendant to "design and implement internal controls . . . to prevent Fresenius from receiving reimbursement for medically unnecessary tests" and "not engage in any conduct or activities that cause[] the submission of claims to Federal health care programs for laboratory tests . . . that lack medical necessity."  (<u>Id.</u>).  For its part, Fresenius argues that the Government has long been aware that it did not have a computer program which limited hepatitis B tests to those within certain guidelines, and that the deposition testimony does not establish that programming the computer to do so was easy, practical or useful.  (Def. Mem. at 17-18).

It is undisputed that Fresenius was under an obligation not to bill Medicare for medically unnecessary tests, and that the CIA required it to implement appropriate internal controls.  As the Government notes, it is not the (known) fact that the Proton System did not limit the tests to certain parameters that is new.  Rather it is the (newly discovered) evidence that Fresenius did not explore the programming option, and/or that the programming could have been done,

that the Government believes is significant.  Whether reprogramming the computer system was either possible or appropriate should be left to the factfinders.  Given the significance of this issue, however, this court finds that the Government has established that newly discovered evidence supports its intervention into this litigation.

3.      Notice of Unnecessary Tests:  The Government contends that discovery revealed that Fresenius was advised on numerous occasions by "educators" from Spectra Labs that Medicare guidelines for BsAG tests were not being followed.  (Gov't Mem. at 10-11).  Not only does Fresenius dispute the Government's interpretation of the reports generated by the Spectra educators, but it also contends that the Government has had this information for many years, including a copy of a Spectra report that the Relator provided before he filed suit.  (Def. Mem. at 18-19).  The Government responds that the report given to it from the Relator did not show excessive BsAG tests, and that "its decision to move to intervene was informed by over 50 Spectra educator reports showing that Fresenius clinics were not following Medicare guidelines for BsAG tests, and that the Spectra educators forwarded this information to Fresenius's Compliance department."  (Gov't Reply at 11).

Again, the merits of the Government's interpretation of the evidence is best left to the factfinder.  This court accepts the Government's explanation that it was the cumulative nature of the reports that was significant in the Government's decision to intervene.  Given the signi-ficance of the evidence regarding Fresenius's knowledge, this court finds that the Government has established the existence of significant newly discovered evidence to support its request for intervention.

[13]

4.      <u>Decision Not to Resume Audit</u>:  Finally, the Government contends that discovery

revealed that Fresenius decided not to continue with its internal audit in 2008, discussed above,

despite learning that the Government's audit did not cover hepatitis B tests.  According to the

Government, Fresenius learned in 2009 that the Government's audit was not going to cover

these tests, but it nevertheless did not resume its internal audit.  (Gov't Mem. at 11-12).

According to the Government, "[t]his evidence is significant because it shows that Fresenius

knew that clinics performing medically unnecessary BsAG tests was a systemic problem, and yet

it chose to do nothing about it.  Even when its own Compliance Audit Manager sought to

quantify the problem, which would have enabled Fresenius to determine the extent of

overpayments by Medicare, the company deliberately stuck its head in the sand."  (<u>Id.</u> at 12).

Fresenius argues that this information was known to the Government concurrently with the

decision not to audit, and, thus, it is not new information.  (Def. Mem. at 19-20).

The Government has not identified any information that it learned through discovery

which lead it to conclude that there was a link between Fresenius' decision not to resume its

audit in 2009 and its knowledge that the Government's audit did not cover hepatitis B tests.

The bare facts have been known by the Government for years.  Thus, it appears that the

Government had contemporaneous knowledge that Fresenius had canceled its audit, that the

Government's audit did not include hepatitis B tests, that Fresenius was informed about the

scope of the Government's audit in 2009, and that Fresenius did not resume its audit.  It may be

that the Government did not understand the significance of these facts until a fuller picture

emerged during discovery, but the Government has not identified any new, relevant informa-

tion learned during discovery.  Thus, there is no "newly discovered evidence" on this point, and

[14]

this court will not rely on the lack of resumption of the audit to support a finding of good cause to intervene at this late date.

     **B.**     **<u>Would Intervention Result in Undue Delay or Prejudice to Fresenius</u>**

     Although the FCA only speaks in terms of "good cause," the cases routinely address whether intervention would be unduly prejudicial to the defendant or would cause undue delay.  <u>See</u>, <u>e.g.</u>, <u>United States ex. rel. Hall v. Schwartzman</u>, 887 F. Supp. 60, 62 (E.D.N.Y. 1995) (intervention allowed where Government had evidence that scope of alleged fraud was more extensive than originally anticipated and it "would not unduly prejudice defendants because it would not result in duplicative discovery or undue delay."); <u>United States ex. rel. Roberts v. Sunrise Senior Living</u>, No. CV 05-3758-PHX-MHM, 2009 WL 499764, at *1 (D. Ariz. Feb. 26, 2009) (intervention allowed where Government had discovered additional evidence and it "would not unduly prejudice or delay this proceeding or the parties."). <u>See</u> <u>also</u> Fed. R. Civ. P. 24(b)(3) (in exercising its discretion as to whether to allow a motion to intervene, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.").  None of the parties have found any cases where either a motion to intervene was denied (at any time in the litigation), or where intervention was allowed after the close of fact discovery.  In this court's view, if the scope of subsequent discovery is limited by the court, there will be no undue prejudice to Fresenius and the matter will not be "unduly delayed" beyond an already lengthy period of litigation.

### <u>Case Scheduling Issues</u>

     As an initial matter the Government argues that no summary judgment deadline has been set, expert discovery has not yet begun and no trial date has been set.  While all true, this

[15]

court finds the argument to be irrelevant under the facts of this case.  At every conference the parties made it clear that the public disclosure bar was a significant issue that might be eliminated if the Government intervened.  As a result, the Government's intervention needed to be decided before summary judgment motions or expert discovery could be scheduled. Therefore, the fact that further scheduling in this case has not taken place cannot be used to excuse the Government's delay in deciding whether or not to seek leave to intervene.

The issue remains as to whether the Government's intervention will engender additional discovery, and, if so, whether such additional discovery will cause Fresenius undue prejudice or delay.  See Schwartzman, 887 F. Supp. at 62 ("the broadening of discovery is generally not a sufficient basis to deny intervention absent a showing of undue prejudice.").  As noted above, the court requested briefing on this issue, which will be discussed below.

## Parties' Positions on Additional Discovery

In connection with its motion to intervene, the Government requests that "fact discovery be reopened for one limited purpose: so that the government can ask Fresenius to produce 125 patient charts randomly selected from the universe of Fresenius patients who received excessive hepatitis B tests during the relevant period."  (Gov't Mem. at 12).  These would be in addition to the 200+ charts that have been produced to the Relator, and the 100 charts produced in response to the subpoena in 2011.  (Id. at 12 n.5).  The Government proposes that once these additional charts are received, expert discovery could begin 60 days later.  During those 60 days, its experts would review the charts, the Government would obtain information from Medicare showing which claims were paid and in what amounts, and the Government's expert statistician would complete a damage analysis.  (Id. at 12-13).

[16]

For its part, Fresenius takes the position that the intervention of the Government would require it to take depositions of Government witnesses, and it objects strenuously to producing additional patient files given the time and expense that has gone into locating, reviewing and copying the hundreds of files produced to date.  While the Relator has paid for copying costs, Fresenius contends that the production of the records going back to 2003 involved "thousands of hours, diverted clinic staff from treatment of patients, and cost Fresenius hundreds of thousands of dollars."  (Def. Mem. at 13).[3]  Fresenius also objects that the Government is requesting information that has already been produced to the Relator following lengthy negotiations.  (Id.).

At oral argument on the motion to intervene, the court asked the parties to address whether additional discovery would be necessary if the Government was allowed to intervene, and the scope of such discovery.[4]  Based on the subsequently filed pleadings, it is Fresenius' first choice that no further discovery take place at all, that the Relator and the Government be limited to previously identified witnesses, and that no other witnesses who work or worked for the Government be permitted to testify.  (Docket No. 189 at 1-2).  In the alternative, Fresenius

---

[3]  The parties have represented that the copying costs to the Relator were over $116,000, while the legal fees incurred by Fresenius in coordinating the records collection and shipping, and conducting a pre-production review for privileged material or protected health information of other patients, exceeded $500,000.  (Docket No. 190 at 5 n.4; Docket No. 193 at 2).  According to Fresenius, "[t]his figure does not account for costs associated with the thousands of hours of staff time that were diverted from clinic operations and patient care."  (Docket No. 193 at 2).

[4]  While the Government contends that first the court should decide whether to allow it to intervene and, only then address whether additional discovery is appropriate, this court finds that some analysis of the need for additional discovery is necessary in order to decide if intervention would result in undue delay and prejudice.  Absent the Government's intervention, fact discovery would otherwise be complete.

proposes that the Government pay the legal fees and copying costs of the collection and production of the 125 patient files, and that the Government not be permitted to take additional discovery from Fresenius.  (Id. at 2-3).  Fresenius further proposes that it be permitted to take discovery from the Government "that it would have been permitted to undertake had the government been a party during discovery, including taking depositions of government witnesses and making written discovery requests of the government."  (Id. at 3).  These would be limited in number to the total amount previously authorized, less the actual discovery already taken.  (Id.).  Finally, Fresenius proposes that the Government be prohibited from calling any witness not previously disclosed by the Relator, or from relying "on any previously undisclosed documents unless served in response to a specific request from Fresenius."  (Id.).

It is the Government's position that it cannot use any of the 100 patient charts that it subpoenaed in 2011 because they were randomly selected from a three year period, not the eight year period at issue in this litigation.  (Docket No. 190 at 2-3).  The Government intends to use 141 of the files produced to the Relator that allegedly reflect BsAG over-testing.  (Id. at 4).  It is seeking the additional 125 charts to "strengthen its statistical sampling analysis."  (Id.).  The Government has indicated, however, that it can provide a statistically significant sampling without the additional charts.[5]

The Government also objects to the limitations on witnesses and documents, including the documents to be reviewed by its experts, proposed by Fresenius.  The Government also contends that the scope of discovery Fresenius needs would not change significantly with the

---

[5]  If this is not the case, the court would recommend that the Government bear the financial burden of any additional production of patient records.

Government's intervention, and that Fresenius should have taken the discovery from the

Government witnesses regardless whether the Government was a party.  (Id. at 5-8).

In this court's view, allowing the Government to obtain the additional 125 patient files

would cause undue burden and delay.  The Relator identified the number of files he needed to

have a statistically significant sampling for allegedly fraudulent tests, including BsAG tests.  The

Government was fully aware of the extended discussions about the production of these records

and the costs that were involved.  Never once during this period did the Government indicate

to the court that it would seek to almost double the number of relevant records concerning

BsAG tests after discovery was closed.  The litigation was delayed for months while the records

were located, copied, reviewed and produced.  Regardless of whether Fresenius has an

obligation to maintain these records, as the Government argues, the reality is that locating and

producing non-current records from all over the country, that span a considerable period of

time, is a labor-intensive and costly proposition.  In this court's view, the time for requesting

such files has passed.  In the alternative, this court recommends that the Government

contribute substantially to the costs involved in such a production.

On the other hand, this court recognizes that the intervention of the Government

changes the scope of the litigation significantly, especially given the removal of the public

disclosure bar to jurisdiction.  While Fresenius may have been able to take discovery from

Government witnesses before, it may not have made sense given the apparently limited

amount of potential damages.  Fresenius should be able to reevaluate its defense of this matter

and take additional discovery.  Similarly, the Government should be allowed to present a

broader case than the Relator was prepared to present and it, too, should have the opportunity

[19]

to propose additional discovery.  This court recommends that the parties be permitted to consult as to the scope of additional discovery and to present any proposals, or disputes, to the court.

## IV.  **CONCLUSION**

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the United States' Motion for Leave to Partially Intervene for Good Cause (Docket No. 178) be ALLOWED.  This court further recommends that future discovery be limited as described herein.[6]

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[6]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).