UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10179-GAO

UNITED STATES OF AMERICA, ex rel.
CHRISTOPHER DRENNEN,
Relator,

v.

FRESENIUS MEDICAL CARE HOLDINGS, INC.,
d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA,
Defendant.

OPINION AND ORDER
May 28, 2024

O'TOOLE, D.J.

This dispute over attorneys' fees and costs arises from the settlement of a qui tam action brought against the defendant, Fresenius Medical Care Holdings, Inc. pursuant to the False Claims Act (the "FCA"), 37 U.S.C. § 3729 et seq. The action was filed by the relator, Christopher Drennen, in 2009, alleging that Fresenius had billed the federal government for certain laboratory tests that were not reasonable or medically necessary under applicable guidelines. After receiving several extensions of time to decide whether to intervene, the government declined to intervene. The complaint was unsealed in February 2011, and later amended the following July in response to Fresenius's motion to dismiss, which was denied.

In 2015, more than six and a half years after Relator Drennen filed his original complaint and after the completion of fact discovery, the government successfully moved to intervene with respect to allegations that Fresenius filed false claims with Medicare for medically unnecessary hepatitis B surface antigen tests. It did not intervene with respect to other fraudulent billing theories related to tests for hepatitis B surface antibody and ferritin.

In 2019, after extensive negotiations the parties executed settlement agreements. Under the settlement, Fresenius agreed to pay the government $5,200,000 and the government agreed to pay Relator $1,430,000, plus a 27.5% share of the accrued interest on the government's recovery. The settlement between Fresenius and the government was only with respect to the FCA claims based on fraudulent billing of antigen testing. The other two claims based on hepatitis B surface antibody testing and ferritin testing were expressly excluded as non-intervened conduct. The government's settlement with Relator was a global settlement except that it reserved any claim for attorneys' fees.

Relator subsequently filed his motion for attorneys' fees and costs, which Fresenius has opposed for numerous reasons, including the attorneys' hourly rates, problematic aspects of the attorneys' billing practices, and the limited nature of Relator's success.[1]

## I.     Fee Request

Typically, "each litigant pays his own attorneys' fees, win or lose, unless a statute or contract provides otherwise." In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 13 (1st Cir. 2012). The FCA is one such statute that provides otherwise. In relevant part, § 3730(d) makes mandatory the granting the relator "reasonable" attorneys' fees, expenses, and costs from the defendant in some circumstances.

To calculate reasonable attorneys' fees, district courts generally start with the "lodestar" method, the "method of choice for calculating fee awards." Pérez-Sosa v. Garland, 22 F.4th 312, 321 (1st Cir. 2022); accord Hutchinson ex rel. Julien v. Patrick, 636 F.3d 1, 13 (1st Cir. 2011). In general, the lodestar is the product of the number of hours reasonably worked and a reasonable

---

[1] Fresenius has also filed a motion contending that the fees request is untimely (dkt. no. 341). That motion is DENIED. Additionally, two motions filed by Relator regarding a status conference (dkt. no. 399) and a referral to a magistrate judge (dkt. no. 403) are TERMINATED as MOOT.

2

hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 295 (1st Cir. 2001) ("GOAL"). To determine the lodestar amount, a court first must "calculate the number of hours reasonably expended by the attorneys for the prevailing party, excluding those hours that are 'excessive, redundant, or otherwise unnecessary.'" Pérez-Sosa, 22 F.4th at 321 (quoting Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emplr. V. Ray Haluch Gravel Co., 745 F.3d 1, 5 (1st Cir. 2014)). The court may further discount the total hours if the time claimed is inadequately documented, Hensley, 461 U.S. at 433, including when available records are "too generic . . . to permit a court to answer questions about excessiveness, redundancy, and the like," Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008). After the number of reasonable hours is determined, the court then "must identify a reasonable hourly rate or rates—a determination that is often benchmarked to the prevailing rates in the community for lawyers of like qualifications, experience, and competence." Pérez-Sosa, 22 F.4th at 321 (quotations omitted). The court may then conduct a "final corrective gesture," electing to "adjust the lodestar amount, either upward or downward, if the specific circumstances warrant such an adjustment." Id.

The party seeking an award has the burden of producing materials that support the request. Hensley, 461 U.S. at 437. "Attorneys' time records, submitted in support of fee requests, often contain questionable entries, and the district court's discretion in separating wheat from chaff is quite broad." Torres-Rivera, 524 F.3d at 340. And while the lodestar method includes arithmetical calculations, the court's "task in fashioning a reasonable fee . . . 'is to do rough justice, not to achieve auditing perfection.'" Pérez-Sosa, 22 F.4th at 321–22 (quoting Fox v. Vice, 563 U.S. 826, 838 (2011)). District judges "need not, and indeed should not, become green-eyeshade

3

accountants," and "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." Id. (quoting Fox, 563 U.S. at 838).

Here, Relator requests the court to award $10,824,456 in merits fees and $724,272 in expenses and costs, in addition to fees for work expended on the fee-related proceedings and subsequent submissions.[2]

## II. Hourly Rates

"[H]ourly rates 'are to be calculated according to the prevailing market rates in the relevant community.'" Guckenberger v. B.U., 8 F. Supp. 2d 91, 105 (D. Mass. 1998) (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984)). The First Circuit places the "burden on a party requesting attorneys' fees to establish—by evidence other than [their] own attorneys' affidavits—the prevailing hourly rate in the community for comparable legal services." Bordanaro v. McLeod, 871 F.2d 1151, 1168 (1st Cir. 1989). Reasonable hourly rates are established "by reference to rates in the court's vicinage rather than in the lawyer's region of origin." GOAL, 247 F.3d at 296 (citing Adcock-Ladd v. Sec'y of Treasury, 227 F.3d 343, 350 (6th Cir. 2000)).

Here, Relator has requested application of hourly rates ranging from $825 per billable hour to $1,140 per billable hour. To be sure, on review of the Relator's several counsels' qualifications and achievements, counsel here performed ably. They collectively pursued the case through discovery on their own and marshalled a strong enough case to persuade the government to

---

[2] Relator later amended its request several times, removing various billing entries in response to Fresenius's critiquing arguments while also enlarging the totals based on purported annual increases in attorney billing rates and additional post-settlement work. The Court rejects the subsequent attempts to amend the request, for substantially the same reasons argued by Fresenius in response. See Lewis v. Kendrick, 944 F.2d 949, 958 (1st Cir. 1991) ("A request for attorney's fees is . . . not an opening gambit in negotiations to reach an ultimate result.") Long ago, the Court requested briefing to cabin the controversy, but Relator's requests have been a moving target throughout the fees litigation, with after-the-fact explanations for errors, simultaneous reductions and increases, and significant requests buried within various declarations.

intervene. Counsel are also well qualified, and possess expertise in the field of qui tam actions, a complex area of the law often requiring specialized knowledge.

That said, however, Relator's fees requests do not establish that their requested hourly rates are the prevailing market rates in Boston for similar services of comparable lawyers. See Blum, 465 U.S. at 895 n.11. First, there is reason to conclude that the attorneys contend that because they work on a contingency basis, the hourly rates they have proposed essentially are devised by taking an already high proposed hourly fee and then more or less adding an apparently arbitrary "premium" because of their specialized knowledge of such cases, the lead roles of at least some of the lawyers, and, significantly, the risks inherent in pursuing a FCA case. Second, the rates claimed are not reliably supported in the Boston legal market. Fees counsel borrows rates by reference to partner rates at large corporate defense law firms, fees which do not establish the norm and have even been rejected by other district judges. See, e.g., Patel v. 7-Eleven, Inc., No. CV 17-11414-NMG, 2020 WL 7626592, at *4–5 (D. Mass. Dec. 10, 2020).

Following the collective guidance or many prior cases, the Court adopts "base rates" described by fees counsel before any additional claimed premiums. Based upon the parties' submissions and relevant authority, those rates are broadly within the range of fair and reasonable hourly professional rates for counsel's work, experience, and diligence in this long running case, especially where much of the work was conducted long ago when rates would have been less. The originally proposed rates are not unreasonable. The claimed base rate for Durrell/Thomas, Worel, and Thronson, who graduated from law school within a few years of one another and have considerable legal experience, is $950 per hour. The claimed base rate for Johnson and Lamberth, who similarly graduated from law school within a few years of each other, is $750. Such rates, as described by fees counsel, are "well within the rates charged by similarly skilled attorneys in

Boston to work on a non-contingent hourly basis."[3] (Decl. of Jeremy L. Friedman in Supp. of Mot. for an Award of Expenses, Att'y's Fees, and Costs ¶ 30 (dkt. no. 345).) Additionally, for the other Parsons Behle & Latimer attorneys involved in the case, I assign a blended hourly rate of $350 as reasonable. See Riley v. Mass. Dep't of State Police, No. 15-14137, 2019 WL 4973956, at *2 (D. Mass. Oct. 8, 2019). The paralegal rate is assigned a reasonable rate of $150 per hour. See id.; Boadi v. Ctr. For Hum. Dev., Inc., 14-CV-30162-KAR, 2017 WL 5178791, at *3 (D. Mass. Nov. 8, 2017).

### III.   Reasonableness of Expended Hours

Relator claims over 11,630 hours for work performed by counsel and staff during the course of the litigation. While much of the work identified in the brief appears reasonably necessary to further the litigation or to prepare the fees petition, there are some noteworthy exceptions identified by Fresenius. Specifically, Fresenius contests the reasonableness of Relator's counsel's expended hours on numerous grounds, including work that does not appear to have been performed, overstaffing, time inflation, improper billing practices, billing attorney rates for clerical work, billing full rates for travel time, charging partner rates for associate-level work, and charging for work it contends is not subject to fee shifting. Fresenius argues that the problems warrant a complete denial of fees. The Court rejects the request to deny fees in their entirety, but for the reasons described below, the Court will reduce the total requested hours by forty percent.

---

[3] For instance, fees counsel describes the non-contingent hourly rate billed by partners at three law firms in Washington DC, where FCA attorneys look for rate information, as ranging from $650 to $1,235 in 2017. Fresenius provides an affidavit regarding fees ranging from $450 to $625.

A.     Work Not Performed

Some billing records suggest that counsel has billed for work that the attorney specified did not actually perform. Indications include identically or near-identically described tasks for different timekeepers on the same date for the same time, as well as entries that are contradicted by other records (e.g., claiming travel time for a deposition that the lawyer attended via videoconference or claiming time for a deposition longer than the time elapsed according to the deposition transcript).  In response to various entries identified by Fresenius, Relator counsel has conceded certain errors and provided explanations for others. But such errors or issues—even if inadvertent or possibly excusable—call into question the overall care or accuracy of the recordkeeping, especially for entries that are not so easily contradicted by other accounts. To adjust for this, the Court will reduce the fee request by five percent.

B.     Overstaffing: Double-Billing by Different Lawyers for Same Work

Numerous entries indicate that multiple attorneys worked on similar tasks, sometimes apparently simultaneously, which Fresenius argues constitutes impermissible double billing. Some of the items are suspicious, such as when a pair of entries for two attorneys charge essentially the same time for the same task on the same date with near identical entries. While courts can, and often do, discount fees requests for overstaffing cases, the "mere fact that more than one lawyer toils on the same general task does not necessarily constitute excessive staffing." GOAL, 247 F.3d at 297. "Effective preparation and presentation of a case often involve the kind of collaboration that only occurs when several attorneys are working on a single issue." Id. Additionally, the Court has already discounted from the total a percentage resulting from entries with indications suggesting the work may not have been performed by the counsel submitting records. The request will not be reduced based on an overstaffing concern.

7

C. Inflation of Time

Many entries suggest that time has been inflated beyond what was spent actually completing the legal task. Indications include routinely charging in large round numbers for "preparation," billing only in even increments of hourly segments (e.g., .2, .4, .6, etc.), and regularly recording at least twelve minutes (.2) for even the most cursory of tasks. For instance, counsel billed .2 for the review of ECF notices, some of which are merely one sentence and would require no more than seconds to read, such as a reassignment of judges or an electronic order granting an extension of time. Indeed, routinely billing in twelve-minute increments risks the same "upward bias" criticized by courts regarding fifteen-minute increments. See, e.g., Pérez-Sosa, 22 F.4th at 331. Consequently, the Court will reduce the fee by ten percent.

D. Improper Billing Practices (Lack of Contemporaneous Billing, Vague Time Entries, and Block Billing)

There is also evidence in the billing records of practices that make it difficult—if not impossible—for the Court to conduct meaningful review, such as block billing, vague time entries, and some indications of a lack of contemporaneous record keeping. For instance, many records simply refer to emails and teleconferences with the client, co-counsel, and/or government attorneys without reference to the substance or purpose, while others simply refer to "Research" or "Emails." Additional records include large blocks of time for multiple tasks, including numerous days billed in one entry of at least eight hours, suggesting that counsel spent an entire day on the case without any non-billable breaks.[4] Many blocks of billed time are even longer, such as a thirteen-hour block described as "Prepare for [B]oston hearing; attend [B]oston hearing; research; travel." (Decl. of

---

[4] For example, on the very first page of the billing records alone, there are six entries with single time blocks of eight hours or more. Another five entries have single time blocks of more than four-and-a-half hours.

Counsel James A. Johnson in Supp. of Mot. for Att'y's Fee Application, Ex. B at 4 ("Johnson Decl.") (dkt. no. 344-3).) An almost eleven-hour entry states "Meet with jim johnson; meeting with chris drennen; review of all spreadsheets; conferences regarding status and strategy; emails to salt lake city regarding status and pleadings." (Id. at 1). Such records impede meaningful review as to the reasonableness of the time spent and whether the time claimed was directed appropriately to the underlying litigation. See, e.g., Torres-Rivera, 524 F.3d at 340; Tenn. Gas Pipeline Co. v. 104 Acres of Land, 32 F.3d 632, 634 (1st Cir. 1994); Hermida v. Archstone, 950 F. Supp. 2d 298, 312 (D. Mass. 2013). Consequently, the Court will reduce the total by ten percent.

E.    Clerical Work

Records also show that counsel, including partners, recorded time for clerical tasks without reducing the billing rate. For example, one attorney's records describe such tasks as "install software for summation to work," "burn CD with Prichard charts and fed ex to opposing counsel," "burn CD with Cary, NC charts and fedex to opposing counsel," "convert depositions to .txt files and upload to depopad," and downloading documents and utilizing optical character recognition. (Johnson Decl., Ex. B at 67, 96, 98, 106.) Other entries detail work related to travel logistics, including "received from ECF and reviewed Notice of Hearing on Motion . . . reschedule airline tickets and hotel," "coordinate travel for client's deposition- book hotel," "make airline and hotel reservations for 9/30 depositions in Boston," and "book airline tickets and hotel room for 10/27 hearing in Boston." (Id. at 69, 92, 94, 120.) However, clerical and administrative tasks such as document organization and copying, scheduling, filing, and making travel arrangements should generally not be billed at attorney rates. See E.E.O.C. v. AutoZone, Inc., 934 F. Supp. 2d 342, 353–54 (D. Mass. 2013) ("Courts have generally regarded the following activities as administrative or clerical functions for which proportionate fee deductions ought be imposed:

9

document preparation, organization, distribution, and copying; drafting emails and other correspondence; data collection; legal cite-checking; scheduling and logistical planning; filing court documents; factual research; and docket review and management."); see also Pérez-Sosa, 22 F.4th at 328. Consequently, the Court reduces the total fee request by five percent.

F.  Travel Time

In addition to the many references to travel in block-style billing records described above, counsel seeks to bill for travel at full attorney amounts. For example, entries include "Travel to and from dinner meeting," "Travel to and from interview at USAO, "Travel from Atlanta to SLC after Smith depo," "Travel from Washington, D.C. after depo home to SLC." (Johnson Decl., Ex. B at 173, 175, 189.) Travel time is often compensated at 50% of an attorney's regular time. See Hermida, 950 F. Supp. 2d at 311; Conservation Law Found., Inc. v. Patrick, 767 F. Supp. 2d 244, 255 (D. Mass. 2011) ("If [an] attorney is merely traveling and not working on the case, . . . courts in this circuit normally reduce the rate charged by fifty percent."). Consequently, the Court reduces the total fee request by three percent.

G.  Associate-Level Work Conducted by Partners at Partner Rates

Counsel here generally appear to have used a top-heavy staffing model resulting in partners billing vast amounts of time for work that is often viewed as associate-level work, such as document review and basic research. Although some of these tasks are necessary to prepare for depositions and the like, counsel's review in this case appears not so cabined and warrants a fee reduction. See, e.g., Brenner v. J.C. Penney Co., No. CIV.A. 13-11212-RGS, 2013 WL 6865667, at *4 (D. Mass. Dec. 26, 2013). The Court will reduce the total fee by six percent to account for partner-level attorneys conducting basic legal tasks more cost-effectively done by associates billing at associate-level rates.

H.      Work Not Subject to Fee-Shifting

(1)     *Time entries spent arranging for own fee arrangement*

Relator counsel submits some time entries for arranging their own fee agreements. The time spent negotiating, reviewing, and drafting a fee arrangement with Relator should be disallowed. See Ryan v. Raytheon Data Sys. Co., 601 F. Supp. 243, 256 (D. Mass. 1984). Therefore, the Court will reduce the overall request by one percent.

(2)     *Work in Reaching Settlement with Government*

Relator's request includes entries relating to settlement. Fresenius argues that these are not chargeable here because they involve negotiating Relator's share with the government. In response, Relator contends that the entries do not involve negotiating with the government for settlement, but instead, generally reflect time communicating about the global settlement of the entire action and reviewing drafts of the settlement agreement. There will be no deduction from the request on this basis. See Pérez-Sosa, 22 F.4th at 322–23.

**IV.    Degree of Success**

Relator claimed in his suit that Fresenius administered and billed for excess laboratory tests for hepatitis antibodies, hepatitis antigens, and ferritin nation-wide. At one point, Relator asserted that potential damages, including potential treble damages and penalties, exceeded 40 billion dollars. (See Relator's Statement of Legal Issues Ripe for Adjudication ¶ 1 (dkt. no. 169) ("Relator contends that, if he is correct [about the inapplicability of the public disclosure bar], potential damages (including treble damages + penalties) exceed $40 billion.")) The government eventually intervened on only one of Relator's theories—antigen testing—and settled the case for $5,200,000. In the settlement agreement between Fresenius and the government, the parties noted that the government had "agreed with Relator to pay Relator $1,430,000 pursuant to 31 U.S.C. §§

11

3730(d)(l) and (2), plus a 27.5% share of any accrued interest at the rate set forth above to Relator by electronic-funds transfer." (Johnson Decl., Ex. A-2 at 3 ¶ 2 (dkt. no. 344-2).) In the settlement agreement between Relator and the government, the parties agreed that Relator was entitled to a share of the proceeds and reasonable expenses, attorneys' fees, and costs, under the same two subsections (as well as 31 U.S.C. § 3730(c)(5)). (See id. at 12 ¶ G ("Relator is entitled to a share of the proceeds of the Fresenius Settlement Agreement, and to reasonable expenses, attorneys' fees and costs in the FCA Civil Action, under 31 U.S.C. § 3730(d)(l) and (2) and pursuant to 31 U.S.C. §3730(c)(5)."); see also id. at 13 ¶ 1 ("The United States shall pay Relator $1,430,000, plus a 27.5% share of any accrued interest ('Drennen Settlement Amount') of the Fresenius Settlement Amount agreed upon by Fresenius and the United States in the FCA Civil Action, pursuant to 31 U.S.C. § 3730(d)(l) and (2) and 31 U.S.C. § 3730(c)(5).")) Relator agreed to dismiss all claims based on both intervened and non-intervened conduct, but reserved his claim for reasonable attorneys' fees, expenses, and costs "pursuant to 31 U.S.C. § 3730(d)(l) and (2)." (Id. at 14 ¶ 4.)

Fresenius now argues that the requested attorneys' fees should be reduced because of the purportedly small degree of success in this matter where the government intervened on only one of Relator's theories and because the fee amount is arguably disproportional to the amount of recovery.

Under § 3730(d)(1) of the FCA, Fresenius is likely correct: because the government did not intervene on two of Relator's theories, and those theories, while related, are not substantially interconnected, he likely is not entitled under § 3730(d)(1) to full attorneys' fees for those on which the government did not intervene. See United States, ex rel. Lovell v. AthenaHealth, Inc., 56 F.4th 152, 161 (1st Cir. 2022) (affirming district court's reduction of attorneys' fees by half because government only intervened on one claim).

However, here Relator also claims fees under § 3730(d)(2), "pursuant to which a qui tam plaintiff may recover fees for a settled 'action' in which the government did <u>not</u> intervene." <u>AthenaHealth</u>, 56 F.4th at 161. The two settlement agreements make plain that the parties contemplated Relator pursuing fees under both §§ 3730(d)(1) and (d)(2), a predictable assertion in light of the government's only partial intervention. In particular, Relator and the government explicitly agreed that Relator was entitled to reasonable expenses, attorneys' fees, and costs under both subsections. <u>Compare</u> <u>id.</u> (agreeing with district court's conclusion that relator waived his § 3730(d)(2) argument by failing to brief the issue before the district court).

Consequently, the Court will not reduce the fee award on the basis that the government only partially intervened in this matter. <u>See e.g.</u>, <u>United States ex rel. Averback v. Pastor Med. Assocs. P.C.</u>, 224 F. Supp. 2d 342, 350 (D. Mass. 2002); <u>U.S. ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc.</u>, 87 F. Supp. 2d 351, 357 (D. Vt. 2000).

**V.**     **Fees on Fees**

Also at issue is Relator's request for fees on fees, that is, the attorneys' fees for Relator counsel and fees counsel for litigating the fees dispute.

As to Relator's counsel, a significant amount of time has been expended trying to justify what outwardly is an exorbitant fee request, conceding various errors and making deductions that should have been exercised prior to filing, and moving the ball several times after filing the opening motion. In some cases, denying fees-on-fees entirely is appropriate. While the Court will not deny Relator counsel's request for fees-on-fees in its entirety, they shall be paid according to the same methodology described above, i.e., the reduced hourly rates with a forty percent reduction to the billed time.

As to fees counsel, Fresenius contends that Relator's fees counsel is not entitled to recovery because the underlying fees motion—reviewed and vouched for by fees counsel—lacks good faith and because fees counsel himself submitted improper billing entries. In response, fees counsel reviewed his time, broke down the total into time periods, and made further reductions to facilitate the resolution of the claim. The numerous concerns in the underlying fees requests, as described above, should have given fees counsel greater pause before endorsing them in a fees petition. However, in light of length, difficulties, and tenor of the fees dispute in this case (attributable to both parties) and fees counsel's self-imposed reductions and what appears generally to be efficient undertaking of work, the Court accepts fees counsel's requested hours at the hourly rate of $850.

## **VI.** **Costs**

Relator also seeks reimbursement of $724,272 that counsel claim were incurred during this case. While necessary and reasonable expenses may be recoverable, numerous entries are problematic. For instance, claimed travel expenses in some cases are extraordinary. One attorney appears to claim over $5,000 for a brief trip to Boston, including $2,774.02 for hotel, taxis, and parking alone. Another quick one-night trip for a sixteen-minute status conference and a meeting involves a charge of $3,478.31 for hotel, taxis, and parking and $223.44 in meals. Yet another claims $1,746.92 for two nights of accommodations for depositions. Other problems include what appear to be "advances" made to Relator and dues paid to a whistleblower-related organization. Consequently, the claimed cost expenses are reduced by ten percent.

## **VII.** **Conclusion**

For the foregoing reasons, Relator's Motion for Award of Reasonable Expenses, Attorneys' Fees, and Costs under the False Claims Act (dkt. no. 342) is GRANTED in part and

DENIED in part. Within twenty-eight (28) days of this Order, the parties shall confer and submit a proposed order for fees, expenses, and costs incorporating the rulings of this Opinion and Order.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.  
United States District Judge